DSS:SDD

13 M288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

Lisong Ma,
    also known as "Ma Li,"

        Defendant.

- - - - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT OF
ARREST WARRANT

(T. 50, U.S.C., §§
1705(a) and 1705(c); T.
15, C.F.R., § 764.2)

EASTERN DISTRICT OF NEW YORK, SS:

      ANTHONY LIMONE, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Commerce ("DOC"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between February 24, 2013 and March 27, 2013, within the Eastern District of New York and elsewhere, the defendant LISONG MA, also known as "Ma Li," together with others, did knowingly, intentionally and willfully attempt to export from the United States to China items under the jurisdiction of the United States Department of Commerce, to wit: one or more spools of Toray type T-800 carbon fiber, without first having obtained the required licenses from the United States Department of Commerce.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 15, Code of Federal Regulations, Section 764.2).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I have been a Special Agent with DOC since September 2010.  I am currently assigned to the Special-Agent-in-Charge Field Office, in New York.  My duties include the investigation and prosecution of violations pertaining to the export of licensable commodities, such as high technology items that have military and aerospace applications. As a Special Agent with DOC, I have participated in numerous investigations into violations of the United States export control laws, during the course of which I have conducted or participated in surveillance, execution of search warrants, debriefings of informants, and review of documents and recorded conversations.

---

[1] The information contained in this affidavit is based upon my conversations with various law enforcement agents, and others, as well as my review of, among other things, reports, personal observations and recordings.  Where statements of others are related herein, they are related in sum and substance and in part.  Where foreign language materials are set forth, they are set forth based on summary and/or draft translations.  Because the purpose of this affidavit is merely to establish probable cause to arrest the defendant, I have not set forth all of the facts and circumstances of which I am aware.

I.   <u>Applicable Export Regulations</u>

2.   The export of so-called "commerce controlled"
items is regulated by the DOC.  Under the International Emergency
Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 <u>et</u> <u>seq</u>., the
President of the United States was granted the authority to deal
with unusual and extraordinary threats to the national security,
foreign policy, and economy of the United States.  Under IEEPA,
the President could declare a national emergency through
Executive Orders that had the full force and effect of law.

3.   On August 17, 2001, under the authority of IEEPA,
the President issued Executive Order 13222, which declared a
national emergency with respect to the unrestricted access of
foreign parties to United States goods and technologies and
extended the Export Administration Regulations (the "EAR"), 15
C.F.R. §§ 730-774.  Through the EAR, the DOC imposed license or
other requirements before an item subject to the EAR could be
lawfully exported from the United States or lawfully re-exported
from another country.  These items are listed on the commerce
control list, or "CCL," published at 15 C.F.R. § 774.  The
President issued annual Executive Notices extending the national
emergency declared in Executive Order 13222 from the time period
covered by that Executive Order through the time of this
affidavit. <u>See</u> 77 Fed. Reg. 49,699 (Aug. 16, 2012).

4.    Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technology from the United States to foreign countries.  In particular, the DOC has placed restrictions on the export of goods and technology that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under IEEPA and the EAR, it is a crime to, among other things, willfully export, conspire to export, attempt to export or aid and abet the export from the United States any item subject to the EAR for which a license is required without first obtaining the license from the DOC.  50 U.S.C. §§ 1705(a) and 1705(c); 15 C.F.R. § 764.2.

II.  The Investigation

5.    DOC, along with the Defense Criminal Investigative Service ("DCIS") and the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), is conducting an investigation into the activities of the defendant LISONG MA and others for attempting to export commerce controlled items from the United States to China, among other countries, without possessing the requisite export license.

6.    Among its investigative measures, HSI maintains a covert presence on various online marketplace websites that

relate to the brokering, purchase and sale of controlled commodities. In addition, HSI administers a website that purports to be for a company (the "Company") that deals in high-technology commodities, including commodities with aerospace and military applications. The Company maintains an on-line "showroom" on an international marketplace website, which depicts various products, including export-controlled items such as carbon fiber, and provides contact information for a purported representative of the Company. (✱)

7. The defendant first came to the attention of investigators on or about February 24, 2013, when, using the name "Ma Li," he emailed the Company using the website contact feature, indicating "I want to buy the product you are selling [on the website]." The defendant added, "Carbon fiber you can export to Japan from Dongli to China? Looking forward to your reply to me, thank you!" The defendant provided an email address and telephone number as contact information. The message was in English. A review of IP login information indicates that the message was sent from mainland China.

8. Following the defendant's inquiry, the defendant and the UC made arrangements to converse via Skype, an online audio/video communication service. In addition, in a February 26, 2013 email, the defendant indicated that he was seeking to acquire three different types of Toray brand carbon fiber: T-300,

(✱) An HSI undercover special agent ( the "UC") maintains the Company website and responds to inquiries that are directed to the Company.

T-400 and T-700. Moreover, on or about March 2, 2013, the defendant indicated to the UC, in a text message, that he was interested in acquiring various types of carbon fiber. Later that month, via Skype, the defendant informed the UC, using a relative as an interpreter, that he was interested in acquiring various types of carbon fiber from the Company.

9. During conversations between the defendant LISONG MA and the UC, the UC expressly informed the defendant that a license from the United States government was required to export certain types of carbon fiber from the United States to China. The defendant inquired about the license application, and indicated that he wanted the UC to apply for a license on his behalf. On March 7, 2013, the UC emailed copies of a license application to the defendant, and requested that he provide the requisite information, including the identity of the end user of the product. Subsequently, the defendant provided responses to questions set forth in the license application, indicating that he intended to obtain 5 tons of Toray type 700 carbon fiber and, with respect to the specific end use of the commodity, stated: "We use in production of floor heating cable and bicycle frame." The defendant also provided the name of a textile company in China as the end user of the commodity.

10. On March 12, 2013, the UC and the defendant engaged in a Skype audio/video teleconference call, which was

recorded.  A mandarin-speaking HSI undercover agent served as an interpreter.  During the call, the defendant and the UC expressly discussed the license requirement to export certain types of carbon fiber from the United States.  The UC explained to the defendant how the license application worked, specifically with respect to Toray type T-700 carbon fiber, which the defendant had requested.  The UC also stated to the defendant, through the Mandarin interpreter: "We can't send this to China without an export license, otherwise we risk going to jail or a fine or some sort of punishment.  If you don't want me to apply for an export license I'll work with you, at your direction."  The defendant replied that he wanted the carbon fiber for "fishing rods" and "electric blankets."  The defendant also informed the UC that he would soon be traveling to the United States, and the defendant and the UC arranged a meeting in New York to further discuss the defendant's desire to obtain various types of carbon fiber.

11.  When the UC asked the defendant how he wanted to proceed if the export license was not approved, and whether he had an alternative, the defendant indicated that he had an alternative, but did not want to get arrested "like the people from Taiwan," presumably referring to two individuals who were arrested last summer for attempting to export carbon fiber from the United States to Taiwan.

12.   Following the March 12, 2013 conversation regarding the T-700 carbon fiber, the defendant and the UC engaged in additional communications in which they discussed the defendant possibly acquiring additional types of carbon fiber. For example, on or about March 14, 2013, the UC indicated to the defendant that he could provide Toray type T-800 carbon fiber, among others, if the defendant was interested.   The defendant indicated that he was in fact interested in acquiring Toray type-800 carbon fiber.

13. On March 15, 2013, the defendant returned a signed copy of a BIS Form 711, which set forth the "nature of the usual business" of the ultimate consignee, a company in China, that was engaged in "manufacturing and seling," [sic] without further elaboration.   The UC incorporated this information into a license application that was submitted to the DOC.[2]

14.   On March 27, 2013, the defendant LISONG MA met with the UC at a warehouse in Brooklyn, New York.   A mandarin-speaking undercover HSI agent was also present for the meeting, and served as an interpreter.   During the meeting, which was covertly recorded, the UC displayed several different types of carbon fiber, including Toray type T-700, T-800 and M55.   The defendant indicated to the UC that he was interested in acquiring

---

[2] The UC submitted the application to the DOC for review.   The application is still pending. As discussed further below, the offense relates to a different type of carbon fiber.

a sample of each type. He specifically asked for small units of carbon fiber because they were "easier" and "safer" to ship.

15. During the March 27, 2013 meeting, the defendant LISONG MA also inquired as to the status of the license application for the T-700. The UC indicated that the license application was still pending with the "Department of Defense" and the "Department of Energy." The defendant stated, "There is a greater chance that the authorities will arrest you if you get a third party involved. That is why it's better to go directly from the U.S. to China." The defendant then packed a box with one spool of T-700, T-800 and M55, which he indicated he wished to ship to China. When the defendant learned that the combined cost for the three spools was approximately $1,500 U.S. dollars, the defendant reconsidered purchasing all three spools at that time.

16. When the defendant discussed with the UC what they should put on the shipping waybill, the UC informed the defendant that, if he wished to try to ship the carbon fiber to China, Federal Express would ask him to identify the contents of the package. When the defendant asked whether they could accurately identify the contents of the package, the UC made clear that each type of carbon fiber needed a separate license, and that U.S. customs officers might inspect the package. The defendant stated that he was considering waiting until the license application

came through, and then seeking the assistance of a relative to send it.  However, the defendant had only submitted information in connection with a license application for Toray type T-700 carbon fiber, and never provided any information or requested any assistance in obtaining a license to export the other type of carbon fiber, T-800.

17.  The defendant LISONG MA and the UC then discussed various methods by which the defendant could transport carbon fiber to China.  The defendant initially indicated that he wanted to carry a small sample of T-800 in his luggage.  The defendant later reconsidered, however, after recounting that he had seen a companion's luggage searched by U.S. customs officers when he arrived in the United States.  When the defendant suggested carrying a sample of carbon fiber in his carry on bag, the UC informed him that that would be just as risky as putting it in his checked luggage.  When the defendant then suggested removing the label from the spool of carbon fiber, the UC informed him that removing the label would bring the authenticity of the fiber into question if examined by end-users down the line.

18.  After conferring with another individual, via telephone, the defendant ultimately decided to ship a sample of Toray type T-800 carbon fiber to China.  The defendant paid the UC $400 in U.S. currency for one spool of T-800 carbon fiber, and placed the spool of T-800 into a plain brown box.  Through the

mandarin-speaking interpreter, the defendant instructed the UC to indicate on the Federal Express waybill and commercial invoice that the package contained "clothing."  In addition, the defendant directed the UC to check a box on the Federal Express waybill that indicated that there was "no license required" in connection with the shipment.  After the defendant finished packing the box and completing the shipping forms, the UC and the defendant transported the box to a courier service in Brooklyn, to be shipped via Federal Express to China.  The defendant used his credit card to pay for the shipping service.  At the conclusion of the meeting, when the UC asked the defendant, "If we do not get the license for the T-700, do you still want to figure out how to get it to China?"  The defendant replied, through the interpreter, "Yes, we will find a way."  The package was thereafter intercepted by law enforcement before it could be transported to China by Federal Express.

III. Potential Uses of High Grade Carbon Fiber

19.   Based on my training and experience, I know that carbon fiber is a commodity, subject to U.S. government license regulations, which has both military and non military uses. Carbon fiber composites are ideally suited to applications where strength, stiffness, lower weight, and outstanding fatigue characteristics are critical requirements.  These composites also

can be used in applications where high temperature, chemical inertness and high damping are important.

20.   The two main applications of carbon fiber are in specialized technology, which includes aerospace and nuclear engineering, and in general engineering and transportation, which includes engineering components such as bearings, gears, cams, fan blades and automobile bodies.  In addition, certain carbon fiber based composites are used in military aircraft.  Type T-800 carbon fiber is an extremely high-grade product, and is used primarily in aerospace and military applications.  Agents have spoken to representatives of the manufacturer, who have indicated that T-800 has applications in aerospace, unmanned aerial vehicles (commonly known as "drones") and other government defense applications.

IV.   <u>License Determination</u>

21.   The DOC has determined that the Toray type T-800 carbon fiber requested by the defendant is under the licensing jurisdiction of the DOC and would require a license for export to China.  The DOC has advised, however, that no licenses have been obtained by any party involved in the proposed export transaction.  The DOC has further determined that Toray type T-800 carbon fiber is classified under Export Control Classification Number 1C010.B, for nuclear non-proliferation and national security reasons.

13

WHEREFORE, because the defendant LISONG MA took a substantial step towards committing the crime of unlicensed export of a commodity controlled by the DOC, your deponent respectfully requests that an arrest warrant issue for the defendant LISONG MA so that he may be dealt with according to law.  Due to the risk of flight of the defendant and/or the destruction of evidence, I further request that the arrest warrant and this affidavit be issued under seal, and that they be unsealed only for the purpose of providing a copy to the defendant and his counsel at the time of the defendant's initial appearance, and shall otherwise remain under seal until further order of the Court.

ANTHONY LIMONE
Special Agent
U.S. Department of Commerce


Sworn to before me this
29th day of March 2013


HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK