

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

F.#2013R00677
DSS:SDD

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 24, 2014

By Hand and ECF

Honorable Sandra L. Townes
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Lisong Ma
                  Criminal Number 13-304 (SLT)

Dear Judge Townes:

        The government respectfully submits this letter in connection with the sentencing of the defendant in the above-referenced case, which is scheduled for February 28, 2014 at 12:00 p.m.  On May 30, 2013, the defendant pleaded guilty to one count of violating the International Emergency Economic Powers Act ("IEEPA") by attempting to export a controlled commodity from the United States to China without a license, in violation of Title 50, United States Code, Section 1705.  Due to the serious nature of the offense and the need to promote respect for the law, a term of incarceration at or near the applicable advisory Guidelines range of 46 to 57 months is appropriate in this case.

**I.**      **Background**

        This case arises from the defendant's attempt to export aerospace-grade carbon fiber from the United States to China, in contravention of U.S. export laws.  As set forth in the Presentence Investigation Report ("PSR"), the defendant came to the attention of law enforcement agents after he made contact with an undercover agent ("UC") of Homeland Security Investigations ("HSI").  (PSR ¶ 9).  As set forth in greater detail below, the defendant was arrested following a meeting with the UC, during which he took possession of a sample of carbon fiber, which he intended would be shipped from the United States to China.  The defendant did not possess a license from the United States government to export carbon fiber.

A. **Applications of High-Grade Carbon Fiber**

As the PSR and the declaration of Leonard Phillips, Jr., (attached hereto as Exhibit A) reflect, carbon fiber is a commodity, subject to U.S. government license regulations, which has both military and non-military uses. Carbon fiber composites are ideally suited to applications where strength, stiffness, lower weight, and outstanding fatigue characteristics are critical requirements. These composites also can be used in applications where high temperature, chemical inertness and high damping are important. The two main applications of carbon fiber are in specialized technology, which includes aerospace and nuclear engineering (such as in the construction of centrifuges), and in general engineering and transportation, which includes engineering components such as bearings, gears, cams, fan blades and automobile bodies. In addition, certain carbon fiber based composites are used in the construction of military aircraft and Unmanned Aerial Vehicles, commonly referred to as "drones." (PSR ¶ 7).

The type of carbon fiber at issue here is an extremely high-grade product, which can be used in gas centrifuge rotor fabrication. (PSR ¶ 8, Phillips Decl. ¶ 3). Toray brand T-800 carbon fiber is regulated by the United States Department of Commerce for nuclear non-proliferation and anti-terrorism reasons. As the Phillips Declaration sets forth, while Toray T-800 carbon fiber carbon fiber can be used in various industries, including the chemical and textile industries, it can also "provide a material contribution to a WMD program." (Phillips Decl. ¶¶ 7, 8). In this case, the defendant ultimately sought to acquire five tons of high grade carbon fiber. (PSR ¶ 11). The defendant also indicated an interest in various other kinds of high grade carbon fiber including Toray brand T-300, T-400, T-700 and M55J. (PSR ¶¶ 10, 16).

B. **The Offense Conduct**

The defendant came to the attention of federal authorities on February 24, 2013 after he contacted a company that purported to deal in high-tech commodities, including commodities with aerospace and military applications. (PSR ¶ 9). The defendant initially contacted the company via email, indicating an interest in purchasing and exporting carbon fiber to China. Following this initial inquiry, a UC made arrangements with the defendant to converse regarding the possible acquisition of carbon fiber. During these conversations, the defendant indicated several times that he was interested in acquiring various types of carbon fiber from the company. In an email sent on February 26, 2013, the defendant informed the UC that he was seeking to acquire three specific types of Toray brand carbon fiber: T-300, T-400 and T-700. (PSR ¶ 10). Subsequently, on March 2, 2013, the defendant sent a text message to the UC reiterating his interest in acquiring various types of carbon fiber. Later that month, the defendant indicated once again that he was interested in purchasing several types of carbon fiber from the company. (PSR ¶ 10).

During these conversations, which were surreptitiously recorded, the UC expressly informed the defendant that a license from the U.S. government was required to

export the commodity from the United States. (PSR ¶ 11). The UC described the license application process, and the defendant initially indicated that he wanted the UC to apply for a license on his behalf. Accordingly, on March 7, 2013, the UC provided the defendant with the application forms, via email, requesting that the defendant provide the requisite information, including the identity of the end user of the product. The defendant responded to the questions set forth in the license application, indicating that he sought to obtain five tons of Toray brand type T-700 carbon fiber to be used "in the production of floor heating and bicycle frame." (PSR ¶ 11). In addition, the defendant provided the name of a textile company in China as the purported end user of the commodity.

On March 12, 2013, the defendant and the UC engaged in a teleconference call, which was recorded. (PSR ¶ 12). A Mandarin-speaking UC served as an interpreter. During this call, the defendant and the UC expressly discussed the license requirement to export certain types of carbon fiber from the United States. For example, the UC told the defendant, through the Mandarin interpreter: "We can't send this to China without an export license, otherwise we risk going to going to jail or a fine or some sort of punishment. If you don't want me to apply for an export license I'll work with you, at your direction." The defendant indicated that he wanted the carbon fiber for "fishing rods" and "electric blankets." Additionally, the defendant informed the UC that he would be traveling to the United States, and they arranged a meeting in New York. When the UC asked the defendant how to proceed if the export license was not approved, the defendant responded that he had an alternative but did not want to get arrested "like the people from Taiwan," presumably referring to an arrest and prosecution in the summer of 2012 for attempting to export carbon fiber from the United States to Taiwan. (PSR ¶ 13). One of the perpetrators involved in that export scheme was recently sentenced to 57 months' imprisonment in United States v. Ming Suan Zhang, 12 CR 666 (NGG) (E.D.N.Y.).

On March 15, 2013, the defendant returned a signed copy of a BIS Form 711, which set forth the "nature of the usual business" of the ultimate consignee, a company in China that was engaged in "manufacturing and seling [sic]," without further elaboration. (PSR ¶ 15). The UC incorporated this information into a license application, but never submitted the application to the DOC because it was incomplete. Accordingly, no export license was ever reviewed or approved by the DOC.

On March 27, 2013, the defendant met the UC and another HSI agent acting as an interpreter in New York. (PSR ¶ 16). At the meeting, the UC displayed several different types of carbon fiber, including Toray type T-700, T-800 and M55J. The defendant indicated an interest in acquiring a sample of each type, and asked for small units because they were easier to ship. The defendant also inquired about the status of the license application for the T-700 carbon fiber, and the UC responded that it was still pending. In addition, the defendant stated that, "There is a greater chance that the authorities will arrest you if you get a third party involved. That is why it's better to go directly from the U.S. to China." (PSR ¶ 16).

The UC advised that each type of carbon fiber needed a separate license to be shipped to China. (PSR ¶ 17). The defendant ultimately decided to ship a sample of Toray type T-800 carbon fiber to China. Notably, the defendant never submitted or requested assistance in obtaining a license for T-800 carbon fiber, and never obtained a license of any kind in connection with the proposed shipment. The defendant paid the UC $400 for one spool of T-800 carbon fiber, and placed the spool into a box. The defendant also instructed the agent to indicate on the Federal Express waybill and commercial invoice that the package contained "clothing," and to indicate that there was "no license required" in connection with the shipment. The defendant and the UC then transported the box to a courier service in Brooklyn, New York, and the defendant paid for the shipping service. (PSR ¶ 18). The package was intercepted by law enforcement following its relinquishment to the courier service.

The DOC has confirmed that Toray T-800 carbon fiber is under its licensing jurisdiction, requiring a license for export to China, and that no license was obtained by any party involved in the proposed export transaction involved in this offense. (PSR ¶ 19). The defendant was arrested on April 1, 2013 at Los Angeles International Airport while attempting to return to China. (PSR ¶ 20).

## II.   Presentence Investigative Report Sentencing Calculation

In the PSR, the Probation Department arrived at the following Guidelines calculation:

Attempted Export Violation

| | |
|---|---|
| Base Offense Level (§ 2M5.1(a)(1)) | 26 |
| Less: Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total Adjusted Offense Level | 23 |

(PSR ¶¶ 33-42). The Probation Department thus calculates that the defendant's total adjusted offense level is 23, which provides for a Guidelines range of 46 to 57 months' imprisonment, within Criminal History Category I. (PSR ¶ 76). This is the same Guideline range set forth in the plea agreement. The statutory range of imprisonment for the count of conviction is 0 to 20 years, pursuant to Title 50, United States Code, Section 1705. (PSR ¶ 75).

On January 27, 2014, the defendant filed an objection and proposed amendment to the PSR, which the government does not oppose. Accordingly, the parties agree as to the relevant facts set forth in the PSR.

## III.   Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to

secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### IV. Analysis

#### A. This Case Implicates National Security

Guidelines Section 2M5.1(a), which applies to the offense of conviction, provides as follows:

>  (a) Base Offense Level (Apply the greater):
>
>  (1) 26, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism; or
>
>  (2) 14, otherwise.

U.S.S.G. § 2M5.1(a).  Application note 2 further provides that "In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences.  Where such factors are present in an extreme form, a departure from the guidelines may be warranted."  Id. app. n.2.  Here, there is no dispute that the type of carbon fiber that the defendant attempted to export is controlled by the United States government for nuclear non-proliferation and anti-terrorism reasons, under Export Control Classification Number 1C210.a.  Moreover, the defendant contemplated a deal involving the potential acquisition of a large quantity of high grade carbon fiber.  Accordingly, level 26 is the appropriate base offense level, with a reduction of three levels for acceptance of responsibility, and the Court may "consider the degree to which the violation threatened a security interest of the United States" in fashioning an appropriate sentence.  Pursuant to the terms of the plea agreement, the government takes no position as to where within the applicable range the defendant's sentence should fall.

>  **B.**     **Statutory Sentencing Factors**

As noted above, the defendant faces a sentence of between 0 and 20 years' imprisonment, pursuant to Title 50, United States Code, Section 1705.  Here, a substantial custodial sentence, at or near the Guidelines range of between 46 and 57 months' imprisonment, is consistent with the Section 3553(a) factors because the crime is serious and there is a compelling need to deter future like offenses.  The unregulated distribution of high-grade materials that are unavailable on the open market, such as Toray type T-800 carbon fiber, poses a serious threat to the national security of the United States.  Indeed, that is the basis for IEEPA.  In this case, the particular type of carbon fiber is controlled for nuclear non-proliferation and anti-terrorism reasons.  Had the defendant succeeded in his attempt to export the commodity, the materials could well have fallen into the hands of regimes or organizations whose interests are adverse to the United States, which is what IEEPA is intended to prevent.  For example, the application of carbon fiber in the construction of nuclear centrifuges is of great concern to the United States in monitoring the development of nuclear capabilities of foreign governments.  See, e.g., Iran: Where We Are Today, A Report to Committee on Foreign Relations, at 6-7, available at https://www.fas.org/irp/congress/ 2009_rpt/iran.html (noting that "[a]mong the most prized materials being sought by Iran are carbon fiber used in the more advanced IR-2

6

centrifuges . . . . We know they received carbon fiber and have used it in IR-2 rotors, but we have no clue where they got it or how much they got") (internal quotation marks omitted).

In addition to the serious nature of the offense, the Court must consider the fact that the defendant was clearly highly motivated to procure the product, notwithstanding the fact that he was expressly informed that it was controlled by the U.S. government. Indeed, the defendant apparently was aware that other individuals had recently been arrested in connection with a very similar scheme, and was willing to pursue the illegal export notwithstanding that knowledge. To promote respect for the laws and regulations that pertain to the proliferation of dangerous commodities, deter future criminal activity, and protect the public, the defendant's crime requires the imposition of a substantial term of incarceration, consistent with the Guidelines.

## V.     Conclusion

For the reasons set forth above, a term of incarceration at or near the applicable advisory Guidelines range of 46 to 57 months is reasonable and appropriate to satisfy the statutory sentencing factors in this case.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:     /s/
Seth D. DuCharme
Assistant U.S. Attorney
(718) 254-6021

cc Ming Hai, esq. (via email and ECF)